**UNITED STATES of America, Plaintiff,**

v.

**Veronica GARCIA–LOPEZ, Defendant.**

**Case No. SACR 09–00134–CJC.**

United States District Court, C.D. California, Southern Division.

March 4, 2010.

Mark P. Takla, AUSA, United States Attorney Office, Santa Ana, CA, for Plaintiff.

Anne Hwang, Federal Public Defender, Santa Ana, CA, for Defendant.

**SENTENCING MEMORANDUM FOR DEFENDANT VERONICA GARCIA–LOPEZ**

CORMAC J. CARNEY, District Judge.

**INTRODUCTION**

Defendant Veronica Garcia–Lopez was brought to the United States from Mexico when she was nine months old and became a legal permanent resident of this country at age 14. While growing up in Santa Ana, California, she was a victim of sexual and physical abuse. She lost her permanent legal resident status and was deported after being convicted of trafficking 4.2 ounces of cocaine as a young adult. She illegally re-entered the United States, and over the next decade she turned her life around, despite being hampered by a serious medical condition. She was in the midst of a contentions custody battle for her seven-year-old son when the boy's father reported her to immigration authorities. On August 19, 2009, Ms. Garcia–Lopez pleaded guilty to illegally re-entering the United States in violation of 8 U.S.C. § 1326(a) and (b)(2). The United States Sentencing Guidelines (the "Guidelines") advise a range of 41 to 51 months imprisonment. Having fully considered the advisory Guidelines range and the sentencing factors contained in 18 U.S.C. § 3553(a), the Court hereby imposes a custodial sentence of six months deemed time

served. The nature of Ms. Garcia–Lopez's offense and her history and characteristics make this case exceptional, and the Guidelines fail to properly capture all of the mitigating factors. A sentence of over six months in custody is unnecessary and unduly harsh.

## FACTUAL BACKGROUND

Veronica Garcia–Lopez is 35 years old. (Probation Officer Presentence Investigation Report ("PSR") ¶ 45.) She was born in Mexico, but her parents brought her to the United States when she was just nine months old. (PSR ¶¶ 45, 47, 49.) Ms. Garcia–Lopez grew up in Orange County with her ten siblings in a three-bedroom home in a working-class neighborhood. (PSR ¶ 49.) Her father and older brothers worked in the construction industry to support the family, and her mother worked at home raising the children. (PSR ¶ 49.) Ms. Garcia–Lopez became a legal permanent resident of the United States when she was around 14 years old. (Def.'s Ex. D.) Her parents and eight of her siblings are United States citizens. (PSR ¶ 47.)

When Ms. Garcia–Lopez was a child, her father rented out the garage to various individuals. (PSR ¶ 49.) One of these individuals was Ms. Garcia–Lopez's uncle, who sexually molested her as a child. (PSR ¶ 49.) Because of this molestation, Ms. Garcia–Lopez began to have difficulty sleeping at night and concentrating in school, where she started to perform poorly. (PSR ¶ 49.) She dropped out after the ninth grade. (PSR ¶ 59.) For many years, Ms. Garcia–Lopez was angry with her father for bringing her uncle into their home. (PSR ¶ 49.) Ms. Garcia–Lopez's sister confirmed that Ms. Garcia–Lopez was sexually molested as a child. (PSR ¶ 53.)

When Ms. Garcia–Lopez was only 15 years old, she married a man ten years her senior. (PSR ¶ 50; Sentencing Hearing, Jan. 25, 2010.) He was physically abusive toward her during their three-year relationship. (PSR ¶ 50.) They had a daughter together when Ms. Garcia–Lopez was 17 years old. (PSR ¶ 50.) About six months after her daughter was born, Ms. Garcia–Lopez returned to live with her parents. (PSR ¶ 50.) Ms. Garcia–Lopez and her husband divorced when she was around 18 years old. (PSR ¶ 50.)

A couple years later, Ms. Garcia–Lopez met another man who was a drug dealer in Las Vegas. (Def.'s Ex. E.) They began a relationship, and she spent her time between Las Vegas and California. (Def.'s Ex. E.) In 1997, Ms. Garcia–Lopez was arrested for trafficking 4 grams of methamphetamine and contributing to the delinquency of a minor based on drugs recovered in her home in Las Vegas. (PSR ¶ 33.) She pleaded guilty and was sentenced to probation. (PSR ¶ 34.) In 1998, Ms. Garcia–Lopez was arrested in California after officers discovered 4.2 ounces of cocaine in the trunk of her vehicle. (PSR ¶ 37.) She pleaded guilty to possession of a controlled substance with the intent to distribute and was sentenced to two years in state prison. (PSR ¶¶ 35, 36.) Ms. Garcia–Lopez also has an outstanding bench warrant for a third 1998 drug offense involving 76.4 grams of cocaine. (PSR ¶ 42.) Ms. Garcia–Lopez states that all of these arrests occurred during her relationship with the same man. (Def.'s Ex. E.)

Because her 1998 drug trafficking conviction was an aggravated felony, Ms. Garcia–Lopez lost her legal permanent resident status and was deported in March 2000. (PSR ¶ 8; Def.'s Exs. D. and E.) Shortly thereafter, she illegally re-entered the United States. (PSR ¶ 8.) Realizing that she had lost everything when she was deported to a country she did not know, Ms. Garcia–Lopez attempted to put things right in her life. (Def.'s Ex. E.) Other

than the 1997–98 drug trafficking offenses, Ms. Garcia–Lopez has no other arrests or convictions. (PSR ¶ 41.)

In 2002, when she was 27 years old, Ms. Garcia–Lopez met and married another man. (PSR ¶ 51.) Ms. Garcia–Lopez reports that he was physically abusive towards her. (PSR ¶ 51.) The year after their marriage, she gave birth to a son, who is now seven years old. (PSR ¶ 51.) Shortly after her son's birth, Ms. Garcia–Lopez was diagnosed with coccidioidomycosis, a fungal infection that spread to her brain. (PSR ¶¶ 55, 56.) Doctors operated and implanted a shunt that carries excess fluid from her brain to her abdominal cavity. (PSR ¶¶ 55, 56.) Ms. Garcia–Lopez has undergone multiple surgeries to replace the shunt and correct shunt malfunctions, one of which was caused by her second husband hitting her. (PSR ¶¶ 55, 56.) Shortly before the initial sentencing hearing date in this case, Ms. Garcia–Lopez was hospitalized after suffering from continuous vomiting, severe pain in the head, and dizziness. The Court continued the sentencing hearing several times while Ms. Garcia–Lopez received medical care. Eventually, physicians at the hospital adjusted her shunt and medication, and she was stabilized. Her condition will require daily medication and constant monitoring. (PSR ¶ 55.) Ms. Garcia–Lopez has indicated that while in custody she felt a great deal of anxiety about protecting her head and being around people who can recognize the symptoms of a shunt malfunctions and immediately transport her to the emergency room. (Def.'s Ex. E.)

Ms. Garcia–Lopez separated from her second husband in 2006, and they ultimately divorced in 2009. (PSR ¶ 51.) Sometime in 2007, an agency contacted Ms. Garcia–Lopez's second ex-husband for child support, which prompted him to initiate child custody proceedings against her. (PSR ¶ 15; Def.'s Ex. A.) During the pro-

ceedings, he repeatedly threatened to contact immigration authorities to have her deported. (PSR ¶ 15, Def.'s Ex. A.) He apparently made good on these threats—a report from a family court mediator confirmed that Ms. Garcia–Lopez's ex-husband had repeatedly contacted immigration authorities to give them her address. (Def.'s Ex. A.) She was deported and re-entered the United States twice between 2007 and 2009. (PSR ¶¶ 9, 10, 11.) Although they initially shared joint custody the child, Mr. Garcia–Lopez's ex-husband currently has full legal custody. (PSR ¶ 51.) In May 2009, a family mediator recommended that Ms. Garcia–Lopez have physical custody of her son, who reported a desire to live with his mother. (Def.'s Ex. A.) Ms. Garcia–Lopez reports suffering from depression due to the events involving her son. (PSR ¶ 53.)

In early 2009, immigration authorities were informed that Ms. Garcia–Lopez had re-entered the United States and was living at her previous address. (PSR ¶ 11.) Ms. Garcia–Lopez was arrested in Santa Ana on June 3, 2009. (PSR ¶ 12.) On August 19, 2009, she pleaded guilty to illegally re-entering the United States in violation of 8 U.S.C. § 1326(a) and (b)(2). (PSR ¶¶ 1–3.)

## ANALYSIS

■ "The basic framework is now settled for the district courts' task ... under the *Booker* remedial regime in which the Guidelines are no longer mandatory but are only advisory." *United States v. Carty*, 520 F.3d 984, 990 (9th Cir.2008) (en banc). First, a district court must calculate the applicable Guidelines range. *Id.* at 991. In doing so, the court should give the parties an opportunity to be heard on what they consider an appropriate sentence. *Id.*

■ Next, a district court must consider the factors laid out in 18 U.S.C.

§ 3553(a), including the Guidelines sentencing range, to see if they support the sentences advocated by the parties. *Id.* The court may not presume that the Guidelines range is reasonable, nor may it give the Guidelines more or less weight than any other § 3553(a) factor. *Id.* "If the district court determines that a sentence outside of the Guidelines is warranted, it must consider the extent of the deviation and whether the degree of variance is justified." *United States v. Higuera–Llamos,* 574 F.3d 1206, 1211 (9th Cir. 2009). Finally, the district court must explain the sentence "sufficiently to permit meaningful appellate review." *Carty,* 520 F.3d at 992.

### A. The Sentencing Guidelines

Ms. Garcia Lopez pleaded guilty to illegal re-entry in violation of 8 U.S.C. § 1326(a) and (b)(2), which sets a base offense level of eight under the Guidelines. U.S.S.G. § 2L1.2(a). Because Ms. Garcia–Lopez had been previously deported after her 1998 felony drug conviction that resulted in a two-year sentence, the Guidelines increase the base level by 16, for a total base level of 24. U.S.S.G. § 2L1.2(b)(1)(A). Ms. Garcia–Lopez pleaded guilty and has admitted involvement in the offense, so she is entitled to a three-level reduction for acceptance of responsibility. U.S.S.G. § 3E1.1(a), (b). Her final offense level is 21. Based on her 1998 drug conviction that resulted in a 16–level increase, Ms. Garcia–Lopez also has a criminal history category of II. U.S.S.G. §§ 4A1.1, 4A1.2. The Guidelines range for Ms. Garcia–Lopez is therefore 41 to 51 months imprisonment. Neither side objected to these calculations.

The government recommended a sentence of 33 months imprisonment, with a two-level downward departure for her medical condition and cultural assimilation. The Probation Officer recommended a sentence of 27 months, with a two-level downward departure for the manner in which she was found in the United States and her medical condition, and another two-level downward departure for pleading guilty. Although she did not enter into a fast-track plea agreement with the government, Ms. Garcia–Lopez waived her rights to a preliminary hearing and indictment, pleaded guilty at the first available court date, and offered to waive her right to appeal. The only right she sought by rejecting the fact-track plea agreement was to argue for a sentence outside of the Guidelines.[1] Ms. Garcia–Lopez requested that the Court vary significantly downward from the Guidelines range.

### B. The § 3553 Factors

▮ The Court next considers the § 3553 factors: the nature and circumstances of the offense and the history and characteristics of the defendant, the need to reflect the seriousness of the crime, the need to afford adequate deterrence, the need to protect the public, the need to provide rehabilitation, the kinds of sentences available, the range imposed by the Guidelines, any pertinent policy statements, the need to avoid unwarranted sentence disparities, and the need for restitution to any victims. 18 U.S.C. § 3553(a).

The § 3553 factors call for a sentence significantly lower than the Guidelines range. First, the circumstances of Ms. Garcia–Lopez's offense and her history and characteristics are unique. While the

---

1. The government argues that Ms. Garcia–Lopez should not receive the four-level benefit of a fast-track plea agreement that she did not accept. The Court imposes a sentence outside the Guidelines because of the § 3553 factors and the cumulative impact of Ms. Garcia–Lopez's mitigating factors, not because of the way in which she pleaded guilty.

government correctly notes that many defendants convicted of illegal re-entry have disadvantaged backgrounds, to call Ms. Garcia–Lopez's background merely "disadvantaged" is an understatement. As a child, Ms. Garcia–Lopez was a victim of sexual abuse. This abuse traumatized Ms. Garcia–Lopez, and she began to have difficulty sleeping and concentrating in school. She dropped out after ninth grade. Compounding her prior abuse, Ms. Garcia–Lopez was married to a man ten years her senior when she was 15, an age at which many girls have not even had their first date. Her husband was also physically abusive. She became a mother at age 17 and divorced her husband at age 18. Not surprisingly, Ms. Garcia–Lopez became involved with drugs as a young adult. She lost everything after a conviction for trafficking 4.2 ounces of cocaine, for which she was sentenced to two years in prison and lost her legal permanent residency status. Even though she was brought to this country as an infant and nearly all of her family members are citizens, she can longer call the United States her home. Ms. Garcia–Lopez's background is not just disadvantaged, but tragic.

Since her conviction for the 1998 drug offense, Ms. Garcia–Lopez has lived a law-abiding life with the exception of her status as an undocumented immigrant. She attempted to improve her circumstances despite a serious medical condition and a second abusive husband. Unlike most other illegal re-entry defendants, Ms. Garcia–Lopez did not appear before this Court because she committed some other crime. She was repeatedly reported to immigration authorities by her second ex-husband, who was trying to obtain an advantage in the bitter custody dispute over their seven-year-old son. Significantly, Ms. Garcia–Lopez's primary motive for returning to the United States twice between 2007 and 2009 was to be with her two children and to continue to fight for custody of her son. In short, Ms. Garcia–Lopez's history and the circumstances of her offense are exceptional compared to other illegal re-entry defendants.

A sentence of 41 to 51 months, or even 33 months or 27 months, as the government and probation office recommend, is unnecessary. Such a lengthy sentence does not reflect the seriousness of the crime in this case. As an otherwise law-abiding person and a caring mother, she is no danger whatsoever to the public. Because her only crime is illegal re-entry, there is also no need for restitution to victims. As for deterrence, Ms. Garcia–Lopez has already served six months in custody and knows that she cannot return to this country. Furthermore, because she has apparently turned her life around, she is not in need of rehabilitative services. Finally, any disparity between Ms. Garcia–Lopez's sentence and other sentences for defendants convicted of illegal re-entry is fully explained by her unique circumstances. Indeed, when a Guidelines calculation emphasizes one factor—here, Ms. Garcia–Lopez's 1998 drug conviction—and not any other important aspects about a defendant's offense or personal circumstances, it treats as similar individuals who are not at all similar.

Taken together, the aggravating and mitigating factors make a 41 to 51 month sentence, as advised by the Guidelines, wholly unwarranted. The aggravating factors include that fact that Ms. Garcia–Lopez has been deported and illegally re-entered three times. She has also been convicted of two drug offenses, one of which was not accounted for in the Guidelines calculation because it was too old, and has an outstanding warrant for a third drug offense. As described above, however, the mitigating factors are significant. Ms. Garcia–Lopez was brought to the United States as an infant, grew up here,

and has been culturally assimilated. She suffers from a serious medical condition for which she has had multiple brain surgeries and lengthy hospital stays. Her qualifying 1998 conviction, eleven years old at the time of her plea, occurred after years of sexual and physical abuse and resulted in the loss of her right to live in this country. But for that conviction, her Guidelines sentencing range would be zero to six months. Since her 1997–98 drug convictions, Ms. Garcia–Lopez has not been arrested for or convicted of any other crimes. She was only found in the United States after being reported by her ex-husband, who is trying to obtain custody of their child. Finally, Ms. Garcia–Lopez's primary motivation for returning to this country was to be with and protect her seven-year-old son, not to engage in criminal conduct. The Court cannot overlook the powerful bond between a mother and a child. These mitigating factors taken together, and not any one factor in isolation, are so significant and unaccounted for in the Guidelines that they make a Guidelines sentence completely inappropriate.

While no criminal conviction may be taken lightly, imprisoning someone like Ms. Garcia–Lopez for almost three years would be a great injustice. As the Supreme Court has noted, "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Gall v. United States,* 552 U.S. 38, 54, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007).

**CONCLUSION**

Considering the factors set forth in 18 U.S.C. § 3553 and Ms. Garcia–Lopez's unique mitigating circumstances, a sentence within the Guidelines range is far longer than necessary and unjustifiably harsh. Ms. Garcia–Lopez is therefore sentenced to a term of imprisonment of six months deemed time served, followed by three years of supervised release.